**UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION**

In re:

MERLIN MERTON MITCHELL, JR.                    CASE NO.:  12-40082-KKS
CANDICE KRUSE MITCHELL,                        CHAPTER:  7

    Debtors.
_____/

SUNTRUST BANK,

    Plaintiff,

v.                                             ADV. PRO. NO.:  12-04014-KKS

MERLIN MERTON MITCHELL, JR.
CANDICE KRUSE MITCHELL,

    Defendants.
_____/

## FINDINGS OF FACT AND CONCLUSIONS OF LAW ON PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (DOC. 34)

Central to the bankruptcy process is the notion of transparency; in order to receive a discharge, debtors must put all of their "cards on the table." SunTrust Bank ("SunTrust") seeks denial of the Debtors' discharge on the basis, *inter alia,* that the Debtors failed to disclose all of their assets and transfers in their Schedules and Statement of Financial Affairs and, as to the assets they disclosed, listed them at incredible values.  The Court must decide whether by their conduct, based on the undisputed material facts, the Debtors left some of their "cards" off the table and essentially hidden from SunTrust, the Chapter 7 Trustee and other creditors such that this Court should deny their discharge.

## BACKGROUND

The basic facts are undisputed.  Ms. Mitchell has two master's degrees in psychology and social work with an emphasis on applied behavioral analysis.  She works for a private company as a behavior analyst for students in public schools.  Mr. Mitchell has a bachelor's degree and

has owned a variety of businesses over the years, including a luxury car garage, two investment companies and the Blue Print Shop, LLC, a company where he is currently employed and that he owns with his wife.  Over the years both Debtors signed notes or personal guarantees for commercial loans for Mr. Mitchell's businesses.  In 2008, Ms. Mitchell received an inheritance of $328,715.83 from her mother's estate.  Between 2008 and 2011 Ms. Mitchell loaned a substantial portion of her inheritance to two of her husband's businesses.  Starting in May of 2010, the Debtors were sued by several creditors on promissory notes and personal guarantees.[1]  At various times during that year the Debtors sold stocks and mutual funds for a total of $340,801.00.  Sometime in 2011 the Debtors began thinking of filing bankruptcy.[2]  In July of 2011, within seven months prior to filing Chapter 7, Ms. Mitchell gave $16,000 of her inheritance money to the Debtors' 25-year-old daughter.  The Debtors filed a voluntary petition for Chapter 7 relief on February 16, 2012.  At the time of filing, the Debtors were represented by a bankruptcy attorney with years of experience in this Court.

Along with their petition the Debtors filed their initial Schedules and Statement of Financial Affairs ("SOFA").  In their initial Schedule B, under category B.4 (household goods and furnishings, including audio, video and computer equipment), the Debtors listed the following items as having a value of $1,455:

> [S]ofa, chairs, table, lamp table, wooden trunk, paintings, secretary chest, 2 side chairs, unfinished desk, rug, baskets, dining table corner cabinets, side board, 10 dining room chairs, rung, hall table, wooden box, wooden clock, rug runner, 9 prints, 2 sofas, coffee table, lamp tables, bench, lamps, old TV, speaks, DVD, turntable, sofa, chair, roll top desk, safe, TV, DVD[3]

The Debtors also listed in their initial Schedule B two boats: a "1995 Chaperell [sic] 17ft inoperable" and "1985 Hughes [sic] Flats boat, 90hp Yahama 2 stroke [inoperable] w/ trailer [bad tires

---

[1] Between May of 2010 and May of 2011, eight separate lawsuits were filed against Mr. Mitchell, Mr. & Ms. Mitchell and the Blue Print Shop, LLC by, among others, Wells Fargo Bank, Florida Bank Group, SunTrust Bank, and Capital City Bank.
[2] At Mr. Mitchell's Rule 2004 examination, taken on May 21, 2012, he testified that he first considered filing bankruptcy "a year ago." (Doc. 33-4 at 74-75).
[3] (Doc. 34-1).

and bearings]," and listed a value for each boat of only $100. The Debtors did not disclose Ms. Mitchell's gift of $16,000 to the parties' daughter seven months prior, nor did they list their sale of any stocks or mutual funds. During the § 341 meeting on March 26, 2012, the Chapter 7 Trustee (the "Trustee") and the attorney for SunTrust questioned the Debtors about discrepancies in their initial Schedules and SOFA.

On April 24, 2012 SunTrust filed a motion, with the Debtors' consent, to take the Debtors' Rule 2004 examination. On April 25, 2012, SunTrust filed a motion seeking an extension of the deadline to file a § 727 complaint, in which it alleged that the Debtors "may have undervalued their assets, may have failed to list all their assets" and may have transferred property within one year prior to filing their Chapter 7 petition.[4] In its filings SunTrust let the parties, including the Debtors, know that the Trustee was hiring an appraiser "to more properly identify and value [the Debtors'] assets." Pursuant to a Consent Order entered May 10, 2012 the Debtors agreed to appear for their Rule 2004 examinations on May 21, 2012.[5] On May 17, the Court authorized the Trustee to retain an appraiser to conduct an appraisal of the Debtors' tangible property.[6] That same day, the Debtors filed their amended Schedules B, I and J and amended SOFA.[7]

On their amended Schedule B the Debtors increased the value of their personal property by a total of $10,390 by making the following changes:

1. They added three items that were not originally disclosed, which they described as: "12 piece silver place setting, 12 each crockery, 10 pictures/crockery, toys,"[8] which increased the values of their personal property by $2,640.

---

[4] (Case No. 12-40082-KKS, Doc. 33).
[5] (Case No. 12-40082-KKS, Doc. 34).
[6] (Case No. 12-40082-KKS, Doc. 39).
[7] (Doc. 34-2.)
[8] The "toys" listed in this category are actually an antique Tonka toy car and truck collection.

2. They increased the values of the two boats: the value of the Chaparral boat went from $100 to $1,500 and the Hewes flats boat increased from $100 to $5,000, increasing the values of their personal property by an additional $6,300.

3. They increased the value of the "1985 VW Rabbit inoperable" from $50 to $1,500, increasing the values of their personal property by an additional $1,450.

The amended SOFA disclosed for the first time, in answer to Question 7 (gifts made by the Debtors within one year pre-petition), the $16,000 gift to their adult daughter, but still made no mention of the sales of stocks and mutual funds.[9]

Notably, the Debtors live in a home listed on their Schedule A as being worth $400,000, but never listed any beds, dressers, bedroom furniture or dishes, pots, pans, or other kitchen-related items on either their original or amended Schedules.

On May 21, 2012 SunTrust took a Rule 2004 examination of both Debtors at which the Debtors produced a list of their personal property entitled "Home inventory Dec. 30, 2011 up dated [sic] 5/17/12" ("list"). Ms. Mitchell testified that she prepared this list at the direction of the Debtors' then bankruptcy attorney in preparation for filing bankruptcy and that she updated the list on May 17, 2012.[10] Mr. Mitchell testified that they updated the list by adding items as a result of a meeting with their then lawyer the week prior to the Rule 2004 exams.[11] Both debtors testified that they gave the updated list to their bankruptcy lawyer with which to prepare their amended Schedule B.[12] The list contains considerably more assets than were listed in either their original or amended Schedule B. The Debtors have not filed this list with the Court, nor have their Schedules ever been amended to include all items on this list not previously disclosed.

---

[9] As of the date of the Debtors' petition their daughter still had this money sitting in an account.

[10] Ms. Mitchell Rule 2004 exam. (Doc. 32-3 at 14).

[11] Mr. Mitchell Rule 2004 exam. (Doc. 33-2 at 40).

[12] In both Affidavits in opposition to SunTrust's Motion for Summary Judgment, the Debtors each testify in paragraph 6, "I thought that I had disclosed all of our material personal property to our bankruptcy attorney, particularly after we went back and prepared the inventory. . . .We gave this inventory to our attorney to prepare the amended schedules. . . ." (Docs. 39-1 & 40-1).

The Debtors' 2010 Federal tax return, filed within 18 months pre-petition, contained the information about the Debtors' sale of $340,801 in stock and mutual funds during 2010 missing from both the initial and amended SOFA. Also missing from the Debtors' original or amended Schedules were loans payable to Ms. Mitchell by the Blue Print Shop, LLC.

SunTrust filed this adversary proceeding on June 11, 2012 seeking denial of the Debtors' discharge under §§ 727(a)(2), (4), and (5). SunTrust alleges that the Debtors are highly educated people who have made a pattern of omissions and misrepresentations in connection with their case that rises to the level of fraudulent intent. According to SunTrust, the Debtors have: transferred and concealed assets of the estate within one year before the filing of the petition, knowingly and fraudulently made a false oath, and failed to satisfactorily explain a loss or deficiency of their assets which causes them to be unable to meet their liabilities. The Debtors maintain, *inter alia,* that they gave the list of their assets to their bankruptcy attorney; they thought the additional assets on the updated list were included in their amended Schedules, and that they either forgot or did not know they had to disclose certain items and transfers.

Having reviewed the entire Record in this adversary proceeding and the relevant case law, for the reasons set forth below the Court finds that SunTrust's Motion for Summary Judgment should be granted and both Debtors' discharges should be denied.

## SUMMARY JUDGMENT STANDARD

Summary judgment is only appropriate when the evidence in the record gives rise to no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.[13] The party moving for summary judgment has the burden to establish that there are no genuine issues of material fact that should be decided at trial.[14] Once that burden is satisfied, the non-moving party must "go beyond the pleadings and by her own affidavits, or by the depositions,

---

[13] Fed. R. Bankr. P. 7056.
[14] *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 606 (11th Cir. 1991).

answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial."[15] There is a genuine issue of fact when the evidence is such that a reasonable jury could find in favor of the non-moving party.[16]  When a debtor's intent is at issue, objections to discharge generally cannot be resolved at the summary judgment stage.[17] "However, in some instances, when the circumstances provide enough evidence of fraudulent intent, courts have found that denial of discharge is appropriate on summary judgment."[18]

## DISCUSSION

### Denial of Discharge - § 727(a)(4)(A)

SunTrust objects to the Debtors' discharge under 11 U.S.C. § 727(a)(4)(A), which provides that a debtor will be denied a discharge if the debtor "knowingly and fraudulently, in or in connection with the case – made a false oath or account."[19] The purpose of § 727(a)(4)(A) is to ensure that sufficient facts are available to all interested persons in the administration of the estate without requiring investigations or examinations to determine whether the provided information is correct.[20]  A party objecting to a debtor's discharge under § 727(a)(4)(A) must establish the following by a preponderance of the evidence: (1) the debtor made a false statement under oath; (2) the debtor knew that the statement was false; (3) the statement was material to the bankruptcy case, and (4) the debtor made the statement with fraudulent intent.[21]  As one Florida bankruptcy court put it, section 727 was enacted to prohibit a discharge "for those who play fast and loose with their assets or with the reality of their affairs."[22]

---

[15] *Hines v. Marchetti*, 436 B.R. 159, 164 (M.D. Ala. 2010) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, at 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (internal quotations omitted)).
[16] *Id.* (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).
[17] *In re Hines*, 418 B.R. 393, 404 (Bankr. M.D. Ala. 2009).
[18] *In re Williamson*, No. 12-06011, 2013 WL 441418 at *5 (Bankr. S.D. Ga. 2013) (citing *Hines v. Marchetti*, 436 B.R. at 169, *aff'd*, 418 F. App'x 797 (11th Cir. 2011); *In re Freitas*, 261 B.R. 556 (Bankr. D.Conn. 2001); *and In re Caserta*, 182 B.R. 599 (Bankr. S.D. Fla. 1995)).
[19] 11 U.S.C. § 727(a)(4)(A).
[20] *In re Ingersoll*, 124 B.R. 116, 122 (M.D. Fla. 1991).
[21] *In re Eigsti*, 323 B.R. 778, 783-784 (Bankr. M.D. Fla. 2005).
[22] *Id.* at 783 (quoting *In re Leffingwell*, 279 B.R. 328, 350 (Bankr. M.D. Fla. 2002)).

### 1. *Did the Debtors knowingly make a false statement under oath?*

To satisfy the first two elements, SunTrust asserts that the Debtors, by signing their Schedules and SOFA (both original and amended) containing multiple inaccuracies and omissions, made false oaths and that because these are educated debtors, it is implausible that they did not know that their Schedules and SOFA contained false information.

The veracity of a debtor's schedules and statement of financial affairs is paramount to the successful administration of a bankruptcy case.[23]   Because the majority of Chapter 7 cases result in no distribution to unsecured creditors, the Bankruptcy Code requires Chapter 7 debtors to fulfill certain fundamental duties, "the most essential of which is the complete and honest disclosure of assets and recent transfers by the debtor."[24]   When a debtor omits important information and does not make a full disclosure, the debtor places his right to discharge in serious jeopardy.[25] "[Section 727] maintains the integrity of the bankruptcy process by insuring that neither the trustee nor the creditors needs 'to engage in a laborious tug-of-war to drag the simple truth into the glare of daylight.'"[26]

Whether the Debtors, or either of them, made a false oath is an issue of fact.  SunTrust urges the Court to find that the Debtors significantly undervalued and omitted numerous items of personal property from their original and amended Schedule B.   The Debtors do not deny having failed to list certain items, and admittedly raised the values of others, but their testimony differs as to why:

1) Jewelry: Both the original and amended Schedule B list only $100 of "Costume Jewelry."

    a. Ms. Mitchell admitted at her Rule 2004 examination that in addition to costume jewelry she owns a wedding ring, a pendant with a stone and diamond chip, a di-

---

[23] *Crews v. Stevens* (*In re Stevens*), 250 B.R. 750, 754 (Bankr. M.D. Fla. 2000). *See also In re Green*, 268 B.R. 628, 648 (Bankr. M.D. Fla. 2001).

[24] *In re Eigsti*, 323 B.R. at 783.

[25] *Heidkamp v. Grew* (*In re Grew*), 310 B.R. 445, 451 (Bankr. M.D. Fla. 2004).

[26] *In re Eigsti*, 323 B.R. at 783 (quoting *In re Leffingwell*, 279 B.R. at 350).

amond ring, and two gold necklaces.  She gave no explanation why she listed only "Costume Jewelry" with a value of only $100 on her original schedules.  As to her amended Schedules she claims that she included the missing jewelry on the list she updated just prior to her Rule 2004 examination in May of 2012 and that she thought they were on her amended Schedule B.  The list that she produced at the Rule 2004 examination on May 21, 2012 contains costume jewelry worth $300, a ring worth $100 and a pendant worth $50.

    b.  At the § 341 meeting, Mr. Mitchell agreed that their Schedule B did not include Ms. Mitchell's wedding band.[27]  At the Rule 2004 examination, Mr. Mitchell testified that he and his wife did not list Ms. Mitchell's wedding band on Schedule B because he "didn't know we included wedding rings."[28]

2)  Tools: The Debtors did not list any tools on their original or amended Schedules.  On the updated list prepared by Ms. Mitchell in preparation for their Rule 2004 examinations the Debtors listed a tool chest, hand tools, a mower, chain saw, skill saw, drill, router, edger and three ladders.

3)  Utility Trailer: The Debtors did not list a utility trailer on their original or amended Schedules, or on the list they provided to their lawyer just prior to their Rule 2004 examinations, but admitted that they own a utility trailer that, as of the petition date, was at a commercial location owned by Mr. Mitchell.[29]

    a.  In her Affidavit, Ms. Mitchell claims that she was not aware the utility trailer existed.

---

[27] (Doc. 31-2 at 16).
[28] (Doc. 33-5 at 91-92).
[29] (Doc. 33-1 at 19, 51-52).

   b.  In his Affidavit, Mr. Mitchell claims that he forgot to list the trailer since it was
       not at his home.[30]

4)  Fishing Rods: Mr. Mitchell owns fishing gear that he did not list on the original or
    amended Schedules.  When questioned at the § 341 meeting, Mr. Mitchell testified that
    he owns five or six rods and reels.[31]  At his Rule 2004 examination he testified that he
    owns three fishing rods with accompanying casting reels and tackle,[32] and that he did not
    list these items in either the initial or amended Schedule B because he "forgot."[33]

5)  Computer Equipment: The Debtors did not list any computers in their original or amend-
    ed Schedules.

   a.  In their Affidavits (Docs. 39-1 and 40-1) the Debtors admit that they own two
       computers, claim that the computers were on the list they gave to their attorney
       just prior to their Rule 2004 exams, and state that they believed the computers
       were included in their amended Schedule B.[34]

   b.  Mr. Mitchell testified at his Rule 2004 examination that they did not list the com-
       puters in the original schedules because they were "not worth anything."[35]

6)  Taxidermy: The Debtors did not list two mounted deer heads and one stuffed bobcat that
    they owned as of the petition date.

   a.  In her Affidavit, Ms. Mitchell states that the two deer heads were included on the
       updated list she prepared in May, and that she believed they were on the amended
       Schedule B.[36]

---

[30] Although Mr. Mitchell claims he "forgot" about the utility trailer because it was not at his home, he listed the VW
Rabbit and a 1968 truck on his original and amended Schedule B, notwithstanding the fact that neither of these were
at their home, either, but were being stored in a rental unit that the parties were paying $200 per month for.
(Doc.33-3 at 43).
[31] (Doc. 31-2 at 23).
[32] (Doc. 33-5 at 94-95).
[33] (Doc. 33-5 at 96).
[34] Once again, the Debtors' references to the "list" are inconsistent.  It appears that the computers were on the updat-
ed list that Ms. Mitchell prepared just prior to the May 21 Rule 2004 examinations.
[35] (Doc. 33-8 at 154).

b. In his Affidavit, Mr. Mitchell says that the bobcat was purchased at a garage sale for three dollars approximately ten years ago, and states, "I think that all taxidermy items have no value but listed the mounted deer heads on the list for $30."[37]

7) Grill: In their Affidavits the Debtors admit to owning a "Big Green Egg Grill" and state that it was included on the updated list they prepared in May. Although both Debtors claim that they "thought" this grill was listed on their amended Schedule B, it was not; nor was it listed in their original Schedules.

8) Boats: The Debtors owned two boats when they filed their Chapter 7 petition that they valued at $100 each on their original Schedules. Three months later the Debtors filed their amended Schedules listing the same boats, in the same condition, at being worth $1,500 and $5,000.

a. At his Rule 2004 examination, Mr. Mitchell claimed that the original $100 value listed for the Hewes flats boat was determined by him sitting across the desk from and discussing it with their bankruptcy attorney.[38] Mr. Mitchell testified that the amended values came from purchase offers he received for both boats. Although he testified that he does not pay attention to boat prices, he claims that he "figured" the amended values were fair because they were what he would take for them: "You see a lot of nice boats with low prices on them sitting on the side of the road."[39] Mr. Mitchell testified that he did not know the horsepower of or number of hours on the engine on the Chaparral boat.[40] Although the Debtors listed both boats as being "inoperable," Mr. Mitchell admitted at his Rule 2004 exam

---

[36] (Doc. 39-1 at ¶ 5B).
[37] (Doc. 40-1 at ¶ 5B).
[38] (Doc. 33-3 at 48).
[39] (Doc. 33-3 at 49).
[40] (Doc. 33-3 at 47-48).

that the only thing wrong with the Chaparral boat was that the engine overheats[41] and that he "uses" (present tense) the flats boat for fishing.[42] The Debtors listed the Hewes flats boat as a 1985 model, but Mr. Mitchell admitted that it could be a 1993 because that is what the public records show.[43] He purchased a new Yamaha motor for it in 1994 or '95 for which he paid $8,000.00, but offered no explanation as to why the boat with that same motor was only worth $100 as of the date they filed bankruptcy.[44]

    b. Ms. Mitchell did not testify about the boats.

9) Ms. Mitchell's Loans to Blue Print Shop, LLC: Ms. Mitchell loaned the Blue Print Shop, LLC money from her inheritance which was not disclosed on the Debtors' original or amended Schedules. The Blue Print Shop, LLC remains an active concern, grosses $45,000 per month[45] and on average pays Mr. Mitchell $4,000 a month.[46]

    a. Mr. Mitchell testified at his Rule 2004 examination that his wife was still owed "thousands of dollars" from the Blue Print Shop, LLC from loans she made "whenever [the company] needed it."[47] Mr. Mitchell testified that:

> Mr. Mitchell: [Ms. Mitchell's] inheritance money made loans to the Blue Print Shop and the Blue Print Shop paid me.
> Q: Paid you wages?
> Mr. Mitchell: Correct.[48]

Mr. Mitchell further testified at his Rule 2004 examination that, "[Ms. Mitchell] loaned [money] to the Blue Print Shop. The Blue Print Shop paid it back to [Ms. Mitchell], and then we used that money to live on."[49]

---

[41] (Doc. 33-3 at 47).
[42] (Doc. 33-5 at 95-97).
[43] (Doc. 33-3 at 50).
[44] (Doc. 33-3 at 51).
[45] (Doc. 33-7 at 123).
[46] (Doc. 33-2 at 27).
[47] (Doc. 33-4 at 63-64).
[48] (Doc. 33-4 at 65).

   b.  Ms. Mitchell testified at her Rule 2004 exam that she did not know whether she was repaid the nine loans she made to the Blue Print Shop, LLC.[50]

   c.  In their Affidavits in opposition to SunTrust's Motion the Debtors state that Mr. Mitchell referred to the money "advanced" to the Blue Print Shop, LLC as "loans" when in fact the "advances have been treated as additional paid in capital from [Ms. Mitchell] as managing member.  There is virtually no chance these advances will ever be paid back."[51] Mr. Mitchell testified in his Affidavit, "I mischaracterized these advances as loans and they have no value."[52]  In their Memorandum of Law in Opposition to the Motion for Summary Judgment, the Debtors argue that, "the substantial amount of money put into the company is better characterized as 'paid in capital.'"[53]

SunTrust also asserts that the Debtors made knowing misstatements or omissions in their SOFA by failing to originally disclose the $16,000 gift to their daughter and by failing to disclose at any time the sales of $340,801 in stock and mutual funds in 2010.   As to the $16,000 gift to their daughter, the Debtors testified that they discussed this pre-petition but that they did not disclose it because Mr. Mitchell received information from an "ex-IRS agent, an accountant" on what they "should call it." The Debtors testified:

> Mr. Mitchell: He said that if it's called – what?
> Ms. Mitchell: Like a stipend.
> Mr. Mitchell: Then it doesn't count as what you're [SunTrust's counsel] trying to make it count as.[54]

Mr. Mitchell also admitted at his Rule 2004 examination that although the $16,000 was for their daughter to pay for an advanced degree, at the time of the gift she was not enrolled in any gradu-

---

[49] (Doc. 33-4 at 66).
[50] (Doc. 32-1 at 10).
[51] (Doc. 39-1 at 6-7 & Doc. 40-1 at 7).
[52] (Doc. 40-1 at 7).
[53] (Doc. 41 at 4).
[54] (Doc. 33-3 at 57).

ate program.[55]  In their Affidavits, the Debtors disavow any intent to deceive, claiming that they did not include the $16,000 gift to their daughter in their original SOFA because they "thought of it nothing more than parents taking care of their child." [56]  The Debtors amended their SOFA to include this gift once the issue was brought to their attention.

As to the missing information about the sales of stock and mutual funds, Question 10 of the SOFA required the Debtors to: "List all other property, other than property transferred in the ordinary course of the business or financial affairs of the debtor, transferred either absolutely or as security *within two years immediately preceding* the commencement of the case."   (Emphasis added.)  In answer to this question, on both the original and amended SOFA, the Debtors responded "none."  Mr. Mitchell testified that he kept track of the family's stock holdings and that they transferred a substantial amount of stock to pay down a loan with Capital City Bank in 2010 but he did not recall how much.[57]  In their Affidavits, neither Debtor explains why they failed to disclose the transfers of stock on their original or amended SOFA but both claim that they did not intentionally omit the transfers.  In their Memorandum in Opposition to Summary Judgment the Debtors avow that they "are not *continuing to conceal* anything about stocks and mutual funds reflected on their 2010 federal tax returns"  and stress that  "[SunTrust] has the tax return and the time of the transfer was before the one-year look back period."[58]

In support of its argument that the Debtors grossly undervalued their personal assets on Schedule B, SunTrust points to the values placed on the Debtors' personal property by two appraisers: one hired by the Debtors, the other by the Chapter 7 Trustee.  The Debtors' appraiser valued their personal property at $22,741; the Chapter 7 Trustee's appraiser valued the Debtors' personal property at $31,900.  The Debtors, of course, argue that the Chapter 7 Trustee's ap-

---

[55] (Doc. 33-3 at 54).
[56] (Docs. 39-1 & 40-1 at ¶5F).
[57] (Doc. 33-5 at 81).
[58] (Doc. 41, emphasis added.)

praiser valued their personal property too high.[59]   SunTrust dismisses this argument as irrelevant because both appraisals show that the Debtors significantly under-valued their personal property; this Court agrees.[60]

Although they themselves raised the values of their boats and the VW Rabbit and added certain items to their list of household goods, thereby increasing the value of their personal property by $10,390, the Debtors say they did not "purposefully omit any item of material value."[61] They also claim they did not purposefully "understate what we in good faith believed to be the reasonable value of our property" essentially because they claim the values of the items they listed were based upon advice from their bankruptcy attorney.[62]

The undisputed material facts, contained within the Debtors' own testimony, do not support the excuse of "my attorney did it" sufficiently to save the Debtors' discharges.  The Debtors' bankruptcy attorney's advice, whatever it was, as to the values of the VW Rabbit and boats was based on these items being "inoperable" which later turned out to be untrue.  For example, Mr. Mitchell testified at the § 341 meeting that the Chaparral boat was listed as inoperable due to a "blown head"[63] and at his Rule 2004 examination that they determined the $100 value "by talking with Mr. Woodward. The engine has a blown head on it."[64]  Later in the same Rule 2004 examination Mr. Mitchell admitted that the only thing wrong with the Chaparral boat was that the engine overheats[65], making it clear that even if their attorney was instrumental in listing the value of the Chaparral boat at $100 it was because the Debtors had told him the boat "inoperable" due to a "blown head," and not that the boat only overheats.

---

[59] On their original and amended Schedule B the Debtors listed the value of their personal property at $2,125 and $12,515, respectively; both amounts well below the appraisers' values.

[60] For purposes of this opinion the Court is focusing solely on the Debtors' personal property that the appraisers valued when doing an inventory of the Debtors' home, plus the utility trailer.  The Debtors listed and valued other property on their Schedule B that is not relevant to this decision.

[61] (Doc. 39-1 & 40-1 at 2).

[62] *Id.*

[63] (Doc. 31-2 at 23)

[64] (Doc. 33-3 at 44).

[65] (Doc. 33-3 at 47)

SunTrust argues that the Debtors' Schedules and SOFA are fraught with statements that the Debtors knew were false and that the Debtors' testimony about the false statements is implausible.  This Court must agree.  Even assuming that the Debtors' bankruptcy lawyer was instrumental in the exceptionally low values for the Debtors' household goods, the Debtors never testified, nor do they argue, that their lawyer was to blame for leaving items and information off of their Schedules and SOFA entirely.

Debtors sign their bankruptcy schedules and statement of financial affairs under penalty of perjury that the information provided and contained within the documents is true and correct.[66]  The Eleventh Circuit has held that "[a]n omission from the debtor's SOFA or schedules may constitute false oaths."[67]  In *In re Eigsti*, the bankruptcy court found that the summary judgment record clearly established that the debtor knowingly made false statements under oath by omitting numerous assets from his schedules and statement of financial affairs and later admitting to the omissions during his depositions.[68]

The facts here are no different:  the Debtors omitted numerous assets from their schedules and transfers from their SOFA and seriously undervalued others.  The Debtors have admitted to their omissions.  Mr. Mitchell admitted to not including the computers because he felt they had no value; he claims they did not list Ms. Mitchell's wedding ring because they did not know they were supposed to; he claims he forgot about the fishing gear and the utility trailer.  Ms. Mitchell provides no explanation as to why she listed her jewelry on both the initial and amended Schedule B as "costume jewelry" valued at $100, and neither Ms. Mitchell's wedding ring nor her two gold chains appear on the list she updated in anticipation of their Rule 2004 exam.  They both admit Ms. Mitchell's $16,000 gift to their daughter and their sales of $340,801 worth of stock and mutual funds.  Incredibly, and on top of everything else, the Debtors did not comply with an

---

[66] *In re Shahid*, 334 B.R. 698, 710 (Bankr. N.D. Fla. 2005).
[67] *In re Phillips*, 476 Fed. App'x 813, 816 (11th Cir. 2012).
[68] *In re Eigsti*, 323 B.R. at 784.

order of this Court requiring them to bring photographs of their household goods to their Rule 2004 examination.  The photos the Debtors brought revealed items not listed in their Schedules, and the Debtors did not bring any pictures of their kitchen, TV room or tool shed, or of the unlisted 57-piece set of sterling silver.[69]

The Debtors' argument that they failed to list certain items because they did not believe they had value is unavailing.  It is well settled in this circuit that it is not for a debtor to decide what does or does not have value; the debtor must list all assets, leaving it to the creditors and trustees to decide for themselves what assets may benefit them.[70]

At the hearing on SunTrust's Motion, Debtors' counsel argued that any deficiencies in the Debtors' Schedules were subsequently amended and that the creditors were ultimately not harmed because they obtained a copy of the updated home inventory list delivered by the Debtors at the Rule 2004 examination.  Amending the Schedules and providing information three months post-petition does not wipe the Debtors' hands clean.[71]   Chapter 7 is not designed to require creditors to dig for or conduct independent examinations to get information about a case.[72] The Debtors' argument – that because SunTrust *now* has the facts regarding their assets their initial failure to list them is excused – does not hold water.  Such a holding would defeat the purpose of § 727(a)(4)(A).

Under certain circumstances, not present here, courts have given favorable weight to a debtor's correction to the schedules and explanation of an omission.  In *In re Wines*, a debtor's

---

[69] (Doc. 32-2 at 17, 19, 20-21).

[70] *See Chalik v. Moorefield* (*In re Chalik*), 748 F.2d 616, 618 (11th Cir. 1984) ("The recalcitrant debtor may not escape a section 727(a)(4)(A) denial of discharge by asserting that the admittedly omitted or falsely stated information concerned a worthless [asset] . . . such a defense is specious."); *In re Boone*, 236 B.R. 275, 280 (Bankr. M.D. Fla. 1999) ("It is not for the Debtor to decide whether a particular item does or does not have value."); *In re Ingersoll*, 124 B.R. at 122 ("Debtors cannot escape disclosure under [§ 727(a)(4)(A)] by claiming that assets omitted are worthless; it is up to the creditors to decide for themselves what assets will be of benefit to them and which will not."); *In re Grew*, 310 B.R. at 451 ("It is not for the debtor to decide what is and is not relevant.").

[71] *See In re Gorgen*, 126 B.R. 806, 808 (Bankr. M.D. Fla. 1991) (noting that, "[i]t is well established that curing an intentional omission from schedules is unacceptable as a defense to a claim under § 727(a)(4)(A) of the Bankruptcy Code."). *See also In re Green*, 268 B.R. 628, 648 (Bankr. M.D. Fla. 2001) ("Subsequent amendments to a debtor's schedules may or may not cure an earlier omission, depending on the circumstances of the case.").

[72] *See In re Stevens*, 250 B.R. at 754.

undervaluation of an asset in his original schedules did not bar his discharge because the debtor corrected his schedules and explained his mistake to the trustee *at the § 341 meeting*.[73]  The court held that the debtor's conduct demonstrated a *bona fide* effort to value his assets.[74]  In *In re Parnes*, the court found that a court may consider a corrective amendment that is voluntary and not made in response to a creditor's objection.[75]

The Debtors' claim that they gave the updated list to their bankruptcy attorney and believed the items on that list were on their amended Schedule B does not save them either.[76]  The Court is unsympathetic to "my attorney did it" where both Debtors are highly educated individuals perfectly capable of reading the pleadings they signed under penalty of perjury.  The Debtors testified that they reviewed and signed both their original and amended Schedule B and SOFA.  They still failed to ensure that all of their belongings were properly listed on their amended Schedule B and SOFA even after knowing that the Trustee had hired an appraiser, that they had to bring pictures of their belongings to their Rule 2004 exams, and that SunTrust was looking towards filing the Complaint that they are now defending; and blame their attorney.  Reliance on the advice of counsel is "no defense where it should have been evident to the debtor that the assets ought to be listed in the schedules.  Debtor[s] cannot, merely by playing ostrich and burying [their] head[s] deeply enough in the sand, disclaim all responsibility for statements which [they] had] made under oath."[77]

In *In re Godley*, the court found that the debtor's explanation that he relied on the advice of his attorney was not reasonable when looking at the nature and extent of the omissions.[78]  The court found that the debtor "by signing the last page of his bankruptcy schedules and his Statement of Financial Affairs, certified that he read each document and that they were true and cor-

---

[73] *In re Wines*, 997 F.2d 852, 857 (11th Cir. 1993).
[74] *Id.*
[75] *In re Parnes*, 200 B.R. 710, 714 (Bankr. N.D. Ga. 1996).
[76] (Debtors' Affidavits, Docs. 39-1 & 40-1).
[77] *Boroff v. Tully* (*In re Tully*), 818 F.2d 106, 111 (1st Cir. 1987) (citations omitted).
[78] *In re Godley*, 164 B.R. 780, 782 (Bankr. S.D. Fla. 1994).

rect to the best of his information and belief."[79]   In the instant case, nothing regarding the amended Schedule B or the list helps explain why the Debtors did not disclose all of their assets (and proper conditions and values) to begin with, failed to disclose the $16,000 gift to their daughter and made absolutely no mention of their sale of more than $340,000 of stocks and mutual funds within two years pre-petition.

In *In re Leffingwell*, the court determined that the defendants knowingly made a false oath when they valued their personal property and furnishings at $1,685, a "ridiculously low value" under the totality of the evidence.[80]   Here, the totality of the material undisputed facts leads to the same conclusion.   The two appraisals and the Debtors' own updated list provided at their Rule 2004 exams show considerably more assets and significantly higher values than the Debtors listed on their initial and amended Schedule B.

### 2. *Were the Debtors' false statements made under oath material?*

A false oath is material and thus sufficient to deny a discharge if it "bears a relationship to the bankrupt's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of his property."[81]   In *In re Phillips*, the Eleventh Circuit held:

> If an omission meets the [*Chalik*] standard, it is irrelevant that the omission concerned worthless assets or did not injure any creditor. A materiality standard based on an omitted item's relative value to the amount of assets and liabilities at issue in the case would encourage debtors to pick and choose which information to disclose based on the debtor's own assessment of value or significance to the bankruptcy administration.[82]

Here, the Debtors completely failed to list certain property and transfers and listed "ridiculously low values" for other assets.   Of course these omissions were material under the *Chalik*-standard.

---

[79] *Id.*
[80] *In re Leffingwell*, 279 B.R. at 347.
[81] *In re Chalik*, 748 F.2d 616, 618 (11th Cir. 1984).
[82] *In re Phillips*, 476 Fed. App'x at 819 (citing *In re Chalik*, 748 F.2d at 618). *See also In re Ingersoll*, 124 B.R. at 123 ("The materiality of a false oath or account does not depend on whether the creditors were prejudiced by the false statement or omission.").

The Debtors argue that certain items appraised by their and the trustee's appraisers were exempt, and that their failure to list those assets on their Schedules does not amount to a false oath on a material fact. This argument is unpersuasive. "Even if debtor can exempt all omitted items if he had duly listed them, the omission is material because a debtor is not automatically entitled to any particular exemption and the omission negates the creditors' right to object to claimed exemptions."[83]

The Court finds that the Debtors' false statements under oath were material because they affected SunTrust's and the Trustee's ability to understand the Debtors' financial affairs. *See In re Leffingwell*, 279 B.R. at 350.

3. *Did the Debtors have the requisite fraudulent intent when making the false oaths?*

Fraudulent intent is largely dependent on an assessment of the credibility and demeanor of a debtor, thus the factual findings will be particularly important.[84] The Court can look to the totality of the circumstances, including the recklessness of a debtor's behavior, to infer whether a debtor submitted a statement with intent to deceive.[85] Because debtors generally will not testify as to their own misconduct, that a false oath was made knowingly and fraudulently is generally proven by circumstantial evidence or inferences drawn from circumstances surrounding the debtor.[86] A party objecting to a discharge under § 727(a)(4) may show the debtor's fraudulent intent either by establishing that the debtor engaged in a pattern of concealment, or that the debtor possessed a reckless indifference to the truth.[87]

The Debtors' conduct here evidences both a pattern of concealment and a reckless indifference to the truth. "While an isolated omission may be attributed to oversight, a pattern of

---

[83] *In re Barbee*, 479 B.R. 193, 201 (Bankr. S.D. Ga. 2012). *See also In re Leffingwell*, 279 B.R. at 350 (quoting *In re Murray*, 249 B.R. 223, 231 (Bankr. E.D.N.Y. 2000) ("It is therefore meaningless to say that [accurate] disclosure is not required because property is exempt. Property can only become exempt through a legal process that includes disclosure.").

[84] *In re Miller*, 39 F.3d 301, 305 (11th Cir. 1994).

[85] *In re Phillips*, 476 Fed. App'x at 816 n.1.

[86] *Id.* (citing *In re Bosse*, 200 B.R. 419, 421 (Bankr. S.D. Fla. 1996)).

[87] *In re Eigsti*, 323 at 784.

omissions clearly warrants the conclusion that the omissions from the Statement of Financial Affairs and the Schedules were made with the requisite fraudulent intent."[88]    In *In re Hoflund*, the debtor failed to list a bank account, a wedding ring, a mantel clock, custom drapes, an encyclopedia and a chandelier.[89] The court found that although the omission of each item alone was not sufficient to deny a discharge, taken together and under the circumstances of the case, the court was convinced that the pattern of omission indicated a reckless disregard for the truth.[90]  In *In re Williamson,* the court looked at the debtor's actions as a whole, noting "[w]hile Debtor amended her SOFA after the 341 Meeting to include the [p]roperty transfer, she did so only after the discovery of the transfer by the chapter 7 trustee. Taken together, these actions show a clear intent to defraud or at least hinder or delay her creditors."[91]   The court in *In re Williamson* denied the debtor's discharge at the summary judgment stage.

This Court is faced with facts similar to those in *In re Hoflund* and *In re Williamson*. While perhaps the exclusion of one piece of jewelry or an old computer would not rise to the level of a denial of discharge, here the Debtors failed to list several assets and severely undervalued others.  Frankly, the Court finds it difficult to believe that the Debtors truly felt that both of their boats were worth only $100, especially since Mr. Mitchell later admitted that neither boat was "inoperable," as stated in their Schedules both times. If this testimony or the values of the listed household goods, boats and car were the only material facts in support of this ruling the Court would be inclined to deny SunTrust's Motion and schedule this matter for trial.

The Court's primary concern, and ultimate ruling, relates more to the things and information that the Debtors chose not to disclose. By not disclosing their sterling silver, antique toy collection, crockery collection and non-costume jewelry the Debtors effectively hid these items

---

[88] *In re Shahid*, 334 B.R. 698, 710 (Bankr. N.D. Fla. 2005).
[89] *In re Hoflund*, 163 B.R. 879, 883 (Bankr. N.D. Fla. 1993).
[90] *Id.*
[91] *In re Williamson*, 2013 WL 441418 at *4.

from all parties, including their own attorney. The Debtors cannot hide behind their attorney's alleged advice as to what values to put down for any of these items because they did not disclose the existence of these items to him before they filed their case; in fact, they did not disclose them to anyone in the case until the Thursday before their Monday Rule 2004 examinations three months into the case.

By not disclosing that they had sold over $340,000 worth of stocks and mutual funds within two years pre-petition the Debtors deprived the Trustee, SunTrust and other creditors of any ability to investigate where this money went. This fact came to light only after SunTrust examined in detail the Debtors' 2010 income tax return. The Debtors' testimony that much of this money went to a bank to pay off or pay down a loan is irrelevant to the Debtors' obligation to disclose these transfers to enable any party to verify the information, and follow (and possibly recover) the cash. The same is true with respect to the Debtors' intentional non-disclosure of Ms. Mitchell's $16,000 gift to her daughter within seven months pre-petition. While Ms. Mitchell's desire to save what was left of her inheritance is understandable, her and her husband's failure to disclose this information in their original SOFA is not.

The material undisputed facts are that the Debtors concealed property and information about transfers of assets until they were forced to reveal the information by the Trustee's hiring of an appraiser and by SunTrust's pursuit of the truth via Rule 2004 examinations, production of documents and court ordered photographs. Only after they could tell that their assets were likely going to be discovered did the Debtors come clean by listing some of the missing assets and information on their amended Schedules and SOFA. At minimum the Debtors acted with a complete disregard for the truth.

SunTrust has met its burden of proof on all of the elements of § 727(a)(4)(A). Taking all of the Debtors' well-pleaded allegations as true, and considering the totality of the undisputed material facts, in particular the Debtors' testimony, supports denial of both Debtors' discharges

under § 727(a)(4).  The Court finds that the Debtors' explanations are insufficient to overcome the fact that their omissions and incorrect values amount to a knowing and fraudulent false oath. SunTrust's Motion for Summary Judgment as to this count should be granted.

<u>Denial of Discharge - § 727(a)(2)(A)</u>

SunTrust also seeks denial of the Debtors' discharges pursuant to § 727(a)(2)(A).  Section 727(a)(2)(A) provides that a debtor's discharge shall be denied if the debtor "with intent to hinder, delay, or defraud a creditor . . . has transferred . . . or concealed . . . property of the estate, within one year before the date of the filing of the petition."[92]  SunTrust argues that the original SOFA states that no gifts were given in the past year, but the amended SOFA discloses the $16,000 gift to the Debtors' daughter.  SunTrust also points to the fact that both the initial and amended SOFA fail to disclose that the Debtors had been providing their daughter an $1,800 monthly allowance in 2011, the year preceding their bankruptcy.

In *In re Hoflund*, the court found that that an omission of property or income from a debtor's schedules may be both a false oath under § 727(a)(4) and fraudulent concealment under § 727(a)(2).[93]  The court inferred the same fraudulent intent found under § 727(a)(4) to § 727(a)(2).[94]  The court in *In re Eigsti* did not.  There, the court found that the record did not definitively establish that the debtor intended to hinder, delay or defraud his creditors through his transfers and omissions, and thus denied summary judgment as to § 727(a)(2) while granting summary judgment as to § 727(a)(4)(A).[95]  Here, as the court did in *In re Eigsti*, the Court finds that the Record does not definitively establish that the Debtors intended to hinder, delay or defraud their creditors through their omissions. For this reason, summary judgment as to § 727(a)(2) is denied.

---

[92] 11 U.S.C. § 727(a)(2)(A).
[93] *In re Hoflund*, 163 B.R. at 883.
[94] *Id.*
[95] *In re Eigsti*, 323 B.R. at 783.

<u>Denial of Discharge - § 727(a)(5)</u>

SunTrust also asserts that the Debtors should be denied a discharge under § 727(a)(5) because they have failed to explain satisfactorily any loss or deficiency of assets to meet their liabilities.  SunTrust asserts that the Debtors possessed assets that are not accounted for, such as the sale of the stocks and mutual funds that were not disclosed on the SOFA.

Debtors must give a satisfactory explanation of their insolvency after commencing their bankruptcy case.[96]  A party objecting to discharge under § 727(a)(5) must establish that the debtor: 1) at one time owned a substantial identifiable asset, 2) not too remote in time from the date of the commencement of the case, 3) on the date of the filing of the voluntary petition the debtor no longer had the particular asset, and 4) when called upon to explain its disposition, was unable to furnish a satisfactory explanation.[97]  A court recently denied a motion for summary judgment where the trustee failed to establish that the alleged transfers which the debtor could not explain caused the debtor to be unable to meet his liabilities.[98]  There, the court found that even if the debtors fail to explain the transfers, the record must show that such transfers create a loss or deficiency of assets which prevents the debtors from meeting liabilities.[99]  Here, SunTrust has not shown that the alleged loss of funds created a loss or deficiency that prevented the Debtors from meeting their liabilities.  Summary judgment on this count must be denied.

## CONCLUSION

This Court and others are hesitant to deny a debtor's discharge at the summary judgment stage when intent is at issue.[100]  The Seventh Circuit has held that credibility issues are left to the trier of fact to resolve on the basis of oral testimony *except* in extreme cases.[101]  Sometimes there is so much circumstantial evidence of fraudulent intent that summary judgment denying a debt-

---

[96] *In re Perry*, 252 B.R. 541, 549-50 (Bankr. M.D. Fla. 2000).
[97] *In re Walden*, 380 B.R. 883, 894 (Bankr. M.D. Fla. 2008).
[98] *In re Seidling*, No. 12-1011-BKC-AJC-A, 2012 WL 4173457 at *1 (Bankr. S.D. Fla., Sept. 19, 2012).
[99] *Id.*
[100] *See In re Hines*, 418 B.R. 393, 404 (Bankr. M.D. Ala. 2009).
[101] *In re Chavin*, 150 F.3d 726, 728 (7th Cir. 1998).

or's discharge is appropriate.[102]  This is just such a case.  The Debtors' numerous misstatements, omissions and inaccuracies, coupled with the Debtors' inadequate explanations, establish a reckless indifference for the truth and pattern of concealment sufficient to deny the Debtors' discharges under § 727(a)(4)(A).  Having fully considered the Debtors' arguments in opposition to the Motion for Summary Judgment and taking the facts alleged in the Debtors' Affidavits as true, the Court finds that holding a trial would be futile, "[s]ince it is unlikely that [the] debtor[s] will admit that [they] intended to hinder, delay, or defraud a creditor. . . ."[103]  For these reasons, it is

ORDERED that SunTrust Bank's Motion for Summary Judgment is GRANTED as to § 727(a)(4)(A) and DENIED as to §§ 727(a)(2) and (a)(5).  The Court will enter a separate final judgment denying the Debtors' discharges.

DONE and ORDERED in Tallahassee, Florida this ___15th day of July, 2013.___.

_____
KAREN K. SPECIE
United States Bankruptcy Judge

cc:  All interested parties

---

[102] *See In re Williamson*, 2013 WL 441418 at *5.
[103] *Hines v. Marchetti*, 436 B.R. at 165.